**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| WESTFIELD INSURANCE COMPANY, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | |
| | : | NO. 10-3696 |
| BELLEVUE HOLDING COMPANY, BHC | : | |
| BUILDERS, INC., BHC VENTURE, INC. | : | |
| and BHC DEVELOPERS LP, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

BUCKWALTER, S. J.                                                                February 23, 2012

      Currently pending before the Court is the Motion for Summary Judgment of Plaintiff

Westfield Insurance Company.  For the following reasons, the Motion is granted and judgment is

entered in favor of Plaintiff on the entirety of its Complaint.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

      **A.      The Policies**

      This case arises out of a series of insurance policies between Plaintiff Westfield Insurance

Company ("Westfield") and Defendants Bellevue Holding Company, BHC Builders, Inc., BHC

Venture, Inc., and BHC Developers LP (collectively "BHC" or "Defendants").  From February 28,

2004 through February 28, 2010, Westfield issued to Bellevue Holding Company six multi-part

commercial policies, each possessing a commercial general liability ("CGL") coverage part and a

commercial umbrella coverage part.  These policies (the "Westfield Policies" or "Policies") include:

CWP 8 263 070 (2/28/04–2/28/05) (WP 0001–35); CWP 8 263 070 (2/28/05–2/28/06) (WP

00036–70); CWP 8 263 070 (2/28/06–2/28/07) (WP 00071–105); CWP 8 263 070

(2/28/07–2/28/08) (WP 00106–140); CWP 8 263 070 (2/28/08–2/28/09) (WP 00142–275); and

CWP 8 263 070 (2/28/09–2/28/10) (WP 00176–211).  (Pl.'s Mot. Summ. J., Ex. B.)  The following

entities are Named Insureds under the Westfield Policies: Bellevue Holding Company, Bellevue

Contractors, LLC, Bellevue Realty Company, BHC Developers, LP, BHC Venture, and BHC

Builders, Inc.  (Id.)

      The Insuring Agreement Portion of the CGL coverage part in each Policy states as follows:

   **1.**    **Insuring Agreement**

      a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

   . . .

      b.    This insurance applies to "bodily injury" and "property damage" only if:

      (1)    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;"

      (2)    The "bodily injury" or "property damage" occurs during the policy period.

(Id. CGL Part § 1(1)(a–b).)  The Westfield Policies go on to define "occurrence" as "an accident,

including continuous or repeated exposure to substantially the same general harmful conditions."

(Id. CGL Part § V(13).)  In addition, they specifically exclude "'[b]odily injury' or 'property

damage' for which the insured is obligated to pay damages by reason of the assumption of liability

in a contract or agreement."  (Id. CGL Part § I(2)(b).)  This exclusion, however, does not apply to

liability "[t]hat the insured would have in the absence of the contract or agreement."  (Id.)

      The Insuring Agreement for the commercial umbrella coverage part in each Policy provides,

in pertinent part, as follows:

    **1.**    **Insuring Agreement**

        a.    We will pay "ultimate net loss' in excess of the "retained limit" that the insured becomes legally obligated to pay as damages because of "personal injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence", and settle any "claim" or "suit" that may result.

        . . .

        b.    This insurance applies only if the "personal injury" or "property damage" occurs during the policy period and is caused by an "occurrence"

(Id. Umbrella Part § I(1)(a–b.)  The definition of "occurrence" is identical to that in the CGL

coverage part.  (Id. Umbrella Part § V(16)(a).)

    **B.**    **The Underlying Actions**

    The BHC Defendants, as property developers, built a residential community of new homes

in Avondale, Pennsylvania.  As a result of this construction, eight actions were commenced against

BHC in the Pennsylvania Court of Common Pleas, Chester County, each alleging damage to the

individual property (the "Property").  These actions include: Barto v. BHC Builders, Inc., No. 09-

8287 (the "Barto" Action); Crowley v. BHC Builders, Inc., No. 11-11385 (the "Crowley" Action);

Eberle v. BHC Venture, Inc., No. 09-13241 (the "Eberle" Action); Ench v. BHC Builders, Inc., No.

09-08288 (the "Ench" Action); Epstein v. BHC Builders, Inc., No. 09-08286 (the "Epstein" Action);

Francois v. BHC Builders, Inc., No. 09-05168 (the "Francois" Action); McCullough v. BHC

Builders, Inc., No. 11-12325 (the "McCullough" Action); and Travers v. BHC Builders, Inc., No.

09-05169 (the "Travers" Action) (collectively the "Underlying Actions" or "Actions").  (Pl's Mot.

Summ. J., Ex. A, Tabs 1–8.)  Because the nature of these Underlying Actions governs the coverage decision in this case, the Court individually summarizes each of them.

### 1.      The *Barto* Action

The Barto Action alleges that, in June 2008, the plaintiffs purchased their home in Avondale, Pennsylvania from the original owners of the Property.  (Pl.'s Mot. Summ. J., Ex. A, Tab 1 ("Barto Compl."), ¶ 9.) Upon hearing about potential problems in their community, the plaintiffs hired an expert to perform an invasive, external forensic review of their home.  (Id. ¶ 17.)   At that time, they were made aware of extensive hidden construction problems with their home, including defective stucco wall system, defective windows, and resultant damage.  (Id.)  The plaintiffs allege that the problems with their home were related to BHC's failure to construct the home in a workmanlike manner, failure to disclose hidden defects known to BHC, false marketing of a home to the public which was not fit for habitation, refusal to honor express and/or implied warranties, refusal to take plaintiffs' concerns seriously, failure to construct a home in a non-negligent manner, and failure to construct the home in accordance with accepted industry standards.  (Id. ¶ 20.)  The Barto Complaint brings eight causes of action: (1) negligence; (2) breach of warranty; (3) breach of express warranty; (4) negligent misrepresentation; (5) fraud/intentional misrepresentation; (6) punitive damages; (7) violation of unfair trade practices and consumer protection law; and (8) product liability.  (Id. ¶¶ 21– 68.)

### 2.      The *Crowley* Action

The Crowley Action is virtually identical to the Barto Action.  The Complaint in Crowley alleges that the plaintiffs moved into their home in 2002, having purchased it directly from BHC, and, in January 2010, contacted BHC about water damage issues with the Property.  (Pl.'s Mot.

Summ. J., Ex. A, Tab 2 ("Crowley Compl.") ¶¶ 15–17.)  BHC, however, failed to make workmanlike repairs, which resulted in further damage.  (Id. ¶ 19.)  On January 21, 2010, the plaintiffs hired an expert who first made them aware of the extensive hidden construction problems with their home.  (Id. ¶ 19.)  BHC, however, allegedly failed to respond to the plaintiffs' complaints other than to accuse them of causing the damage themselves.  (Id. ¶ 21.)  The plaintiffs allege that the problems with their Property were related to BHC's failure to construct the home in a workmanlike manner, failure to disclose hidden defects known to BHC, false marketing of a home not fit for habitation, refusal to honor all warranties (including express and/or implied warranties) failure to construct a home in a non-negligent manner, and failure to construct a home in accordance with accepted industry standards.  (Id. ¶ 23.)  The complaint contains eight causes of action: (1) negligence; (2) breach of warranty; (3) breach of express warranty; (4) negligent misrepresentation; (5) fraud/intentional misrepresentation; (6) punitive damages; (7) violation of unfair trade practices and consumer protection law; and (8) product liability.  (Id. ¶¶ 24–71.)

### 3.      The *Eberle* Action

The Eberle Action also involves a suit by the purchasers of a BHC-constructed home in Avondale, Pennsylvania.  (Pl.'s Mot. Summ. J., Ex. A, Tab 3 ("Eberle Compl.") ¶ 30.)  In that case, the plaintiffs became aware, in November 2008, of significant building and structural defects to other stucco homes in their neighborhood.  (Id. ¶ 36.)  Subsequently, they had an inspection of the Property performed to determine whether their Property had any water/mold/stucco or other structural damage.  (Id. ¶ 37.)  That inspection revealed substantial damage, for which they received remediation quotes in the range from $71,729.50 to $127,992.41.  (Id. ¶¶ 40–41.)  The plaintiffs sued multiple entities involved with the construction of their home.  With respect to BHC, the

plaintiffs alleged negligence for failure to follow pertinent codes, failure to ensure that its subcontractors followed pertinent codes, and failure to timely notify the Township of certain phases of construction to allow it to perform regular inspections.  (Id. ¶¶ 43–62.)  The complaint also alleged breach of contract (unworkmanlike performance) due to its construction of the Property in a "poor, improper, and unworkmanlike manner" and its failure to cure its breaches.  (Id. ¶¶ 70–77.)  Finally, plaintiffs claimed breach of express and implied warranties, based on the One Year Warranty and Ten Year Warranty covering various aspects of the Property.  (Id. ¶¶ 78–86.)

### 4.      The *Ench* Action

The plaintiffs in the Ench Action purchased their Property in January 1999 from Defendants.  (Pl.'s Mot. Summ. J., Ex. A, Tab 4 ("Ench Compl.") ¶ 9.)  In November 2001, they first discovered leaks in their windows and contacted BHC's representatives, who performed some repairs on the Property.  (Id. ¶¶ 17–19.)  Again, in late 2003, the plaintiffs had problems relating to the leaking windows and requested repairs from BHC, through a manufacturer known as Malta.  (Id. ¶¶ 20–21.)  Beginning in April 2007, the plaintiffs spoke to BHC representatives on numerous occasions about problems starting to occur with bowing sashes on windows and stucco cracks.  (Id. ¶ 22.)  Although BHC performed some repairs in July 2007, the water intrusion continued due to a faulty stucco cladding system and rotted framing.  (Id. ¶¶ 23–24.)  When the plaintiffs realized, in June 2009, that other homes within the development were having similar water intrusion problems, the plaintiffs hired an expert to perform an exhaustive review of their home.  (Id. ¶¶ 25–26.)  Upon review, the expert noted hidden water leaks behind the stucco walls, which had been occurring for several years causing massive rotting of the home's framing structure.  (Id. ¶ 26.)  The plaintiffs allege that the problems were related to the failure of BHC to construct the home in a workmanlike manner, failure

to disclose hidden defects, causing of the plaintiffs to rely on the defendants, false marketing of a home not fit for habitation, refusal to honor implied and/or express warranties, failure to construct a home in a non-negligent manner, failure to construct a home in accordance with industry standards, and other negligence.  (Id. ¶ 29.)  Their complaint has eight causes of action: (1) negligence; (2) breach of warranty; (3) breach of express warranty; (4) negligent misrepresentation; (5) fraud/intentional misrepresentation; (6) punitive damages; (7) violation of unfair trade practices and consumer protection law; and (8) product liability.  (Id. ¶¶ 31–78.)

## 5. The *Epstein* Action

In the Epstein Action, the plaintiffs purchased the Property in March of 2007, unaware of any defects in the home.  (Pl's Mot. Summ. J., Ex. A, Tab 5 ("Epstein Compl.") ¶ 9.)  As in the other actions, BHC was the builder of the property and had indicated to the original buyers that it was "fit for habitation, built with good workmanship, and free from defects."  (Id. ¶ 10.)  In April 2009, the plaintiffs first discovered water stains in their family room and a "soft spot" on the floor of the laundry room.  (Id. ¶ 15.)  After making inquiries in the neighborhood, they learned that many homes in the community were experiencing serious water penetration issues within their homes.  (Id.)  In May 2009, the plaintiffs hired an expert who performed a forensic review of their home and discovered extensive hidden construction problems.  (Id. ¶ 17.)  The plaintiffs allege that the problems were related to the failure of BHC to construct the home in a workmanlike manner, failure to disclose hidden defects, causing of the plaintiffs to rely on the defendants, false marketing of a home not fit for habitation, refusal to honor implied and/or express warranties, failure to construct a home in a non-negligent manner, and failure to construct a home in accordance with industry standards.  (Id. ¶ 20.)  Like many of the aforementioned complaints, the Epstein complaint sets forth

the following causes of action: (1) negligence; (2) breach of warranty; (3) breach of express warranty; (4) negligent misrepresentation; (5) fraudulent misrepresentation; (6) punitive damages; (7) violation of unfair trade practices and consumer protection law; and (8) product liability.  (Id. ¶¶ 21–68.)

### 6.     The *Francois* Action

The Francois Action bears striking similarity to the Epstein Action.  In that case, the plaintiffs purchased their Property from BHC on January 16, 2000.  (Pl.'s Mot. Summ. J., Ex. A, Tab 6 ("Francois Compl.") ¶ 9.)  At the time they moved into the Property, the plaintiffs were not aware of any of the numerous problems experienced by other properties in their development.  (Id. ¶ 16.)  They first discovered these defects in late 2006, when they found water damage to their first floor study.  (Id. ¶ 17.)  They informed BHC in writing of the significant water damage to their home in both October and November 2006.  (Id. ¶¶ 18–20.)  On both occasions, BHC refused to adequately respond other than to accuse the plaintiffs of causing the damage.  (Id. ¶ 21.)  The plaintiffs allege that the problems were related to the failure of BHC to construct the home in a workmanlike manner, failure to disclose hidden defects, causing of the plaintiffs to rely on the defendants, false marketing of a home not fit for habitation, refusal to honor implied and/or express warranties, failure to construct a home in a non-negligent manner, failure to construct a home in accordance with industry standards, and being otherwise negligent.  (Id. ¶ 23.)  Like the above actions, the Epstein complaint has eight causes of action, as follows:  (1) negligence; (2) breach of warranty; (3) breach of express warranty; (4) negligent misrepresentation; (5) fraud/intentional misrepresentation; (6) punitive damages; (7) violation of unfair trade practices and consumer protection law; and (8) product liability.  (Id. ¶¶ 25–72.)

### 7.    The *McCullough* Action

The plaintiffs in the McCullough Action purchased their home from the previous owners on December 17, 2006, and were under the belief that the Property was, in all respects, fit for habitation, built with good workmanship, and free from defects.  (Pl.'s Mot. Summ. J., Ex. A, Tab 7 ("McCullough Compl."), ¶¶ 11, 13.)  Over the course of time, the plaintiffs saw signs of water penetration problems on their home—a problem experienced by several neighboring homes in the community.  (Id. ¶ 18.)  They hired an expert in December 2009, who confirmed that there were water penetration issues and extensive hidden construction problems with their home, including a defective stucco wall system, defective windows, and resultant damage.  (Id. ¶ 19.)  The plaintiffs claim that these problems resulted from BHC's failure to construct the home in a workmanlike manner, failure to disclose hidden defects, false marketing of a home not fit for habitation, refusal to honor all warranties, failure to construct the home in a non-negligent manner, and failure to construct the home in accordance with accepted industry standards.  (Id. ¶ 21.)  The McCullough Complaint also has eight causes of action:  (1) negligence; (2) breach of warranty; (3) breach of express warranty; (4) negligent misrepresentation; (5) fraud/intentional misrepresentation; (6) punitive damages; (7) violation of unfair trade practices and consumer protection law; and (8) product liability.  (Id. ¶¶ 22–69.)

### 8.    The *Travers* Action

Finally, in the Travers Action, the plaintiffs purchased the Property from the original owners in April 2001, under the belief that the Property was fit for habitation, built with good workmanship, and free from defects.  (Pl.'s Mot. Summ. J., Ex. A, Tab 8 ("Travers Compl."), ¶¶ 10–12.)  In 2002, the plaintiffs contacted BHC about water damage issues, and BHC, through its selected roofer, made

inadequate repairs.  (Id. ¶¶ 17–18.)  Over the course of time, however, the plaintiffs lodged repeated requests related to the minor surface leakage of water into the home, but were not aware of the massive hidden damage occurring between the exterior stucco wall system and the external drywall. (Id. ¶ 19.)  Ultimately, in March 2009, the plaintiffs hired an expert who notified them of the extensive hidden construction problems with their home.  (Id. ¶¶ 20–21.)  On all occasions, however, BHC failed to adequately respond to the plaintiffs.  (Id. ¶ 22.)  As of March 2009, the plaintiffs learned that this was a neighborhood-wide problem.  (Id. ¶ 23.)   As with all of the aforementioned complaints, the plaintiffs assert that these problems resulted from BHC's failure to construct the home in a workmanlike manner, failure to disclose hidden defects, false marketing of a home not fit for habitation, refusal to honor all warranties, failure to construct the home in a non-negligent manner, and failure to construct the home in accordance with accepted industry standards. (Id. ¶ 24.)  The Travers complaint has eight causes of action:  (1) negligence; (2) breach of warranty; (3) breach of express warranty; (4) negligent misrepresentation; (5) fraud/intentional misrepresentation; (6) punitive damages; (7) violation of unfair trade practices and consumer protection law; and (8) product liability.  (Id. ¶¶ 25–72.)

### C.     The Initiation of the Present Litigation

Following BHC's demands for defense and indemnification from Westfield under the Policies, Plaintiff Westfield initiated the present action on July 28, 2010.  In its Complaint, it indicated that it had been providing a defense to BHC in the Underlying Actions subject to a reservation of rights in which Westfield reserved all rights to deny coverage for the Underlying Actions.  (Compl. ¶ 53.)  By virtue of the federal litigation, it now seeks a declaration from this Court that it has no duty to either defend or indemnify the Defendants in the Underlying Actions.

(Id. ¶¶ 59–65.)  Plaintiff moved for summary judgment on its Complaint in December 2011, and the parties continued to brief the Motion through January 26, 2012.  Having considered the record and legal arguments presented by the parties, the Court now turns to the merits of the Motion.

## II.     STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. Cnty of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

11

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. Anderson, 477 U.S. at 249–50.

## III.   DISCUSSION

Plaintiff's Motion is premised on the notion that, under the language of the Westfield Policies, it has no obligation to either defend or indemnify. Because these legal duties have differing standards, the Court discusses each individually.

### A.   **Duty to Defend**

"Pennsylvania's courts[1] have taken a relatively broad view in discerning whether a

---

[1] The parties dispute the appropriate choice of law. Plaintiff contends that, despite the fact that all of the BHC entities are based in Delaware and that the policies at issue were purchased in Delaware, Pennsylvania law clearly applies because no "true conflict" of law exists. See Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co., 609 F.3d 223, 230 (3d Cir. 2010) (holding

complaint triggers the insurer's duty to defend." Berg Chilling Sys. v. Hull Corp., 70 F. App'x 620, 624 (3d Cir. 2003). "An insurance company's duty to defend a suit against an insured is determined solely on the basis of the allegations of the complaint in the underlying action." Nat'l Fire Ins. Co. of Hartford v. Robinson Fans Holdings, Inc., No. Civ.A.10-1054, 2011 WL 1327435, at *1 (W.D. Pa. Apr. 7, 2011); see also Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co., 908 A.2d 888, 896 (Pa. 2006). In other words, "[a] carrier's duty to defend and indemnify an insured in a suit brought by a third party depends upon a determination of whether the third party's complaint triggers coverage." Kvaerner, 908 A.2d at 896 (quoting Mut. Benefit Ins. Co. v. Haver, 725 A.2d 743, 745 (Pa. 1999)). That duty "is broader than the duty to indemnify, in that the former duty arises whenever an underlying complaint may 'potentially' come within the insurance coverage." The Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co., 193 F.3d 742, 746 (3d Cir. 1999). An insurer is not required to defend a claim when it is apparent on the face of the complaint that none of the injuries fall within the purview of the insurance policy. Peerless Ins. Co. v. Brooks Sys. Corp., 617 F. Supp. 2d 348, 356 (E.D. Pa. 2008).

Under these standards, a court must engage in two separate steps to determine whether Westfield has a duty to defend BHC in the Underlying Actions: (1) interpretation of the language of

---

that where the states' laws are not in conflict, there is no "true conflict" of law and Pennsylvania law applies). Defendants, on the other hand, "do[] not concede this point," in light of the parties' connections with Delaware and in light of the fact that Delaware "prescribes a somewhat different analysis than does Pennsylvania law." (Defs.' Resp. Opp'n Mot. Summ. J. 2.) While adding a footnote cursorily discussing Delaware's law on this subject, however, Defendants offer no choice of law analysis and do not engage in any meaningful effort to identify the differences between Pennsylvania and Delaware law. Rather, they choose to simply address Plaintiff's arguments under Pennsylvania law while purportedly "preserving the choice of law issue." (Id.) Absent a substantive discussion by the parties and absent any facially-obvious substantive distinction in the two states' laws, the Court deems Defendants' choice of law argument waived and will, like the parties, apply Pennsylvania law to the present dispute.

the Westfield Policies; and (2) analysis of whether the complaints in the Underlying Actions potentially fall within the bounds of coverage of the Policies.  The Court takes each step individually.

### 1.    Interpretation of the Insurance Policies

The interpretation of an insurance policy is a question of law.  401 Fourth Street v. Investors Ins. Co., 879 A.2d 166, 170 (Pa. 2005).  The primary goal in interpreting a policy is to ascertain the parties' intentions as manifested in the policy's terms.  Id. at 171.  "When the language of the policy is clear and unambiguous, a court is required to give effect to that language."  Id.  On the other hand, where a policy provision is ambiguous, "the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage."  Id.

As set forth above, the Westfield Policies define "occurrence" as  "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (Pl.'s Mot. Summ. J., Ex. B, CGL Part § V(13); Umbrella Part § V(16)(a).)  The Supreme Court of Pennsylvania, in the case of Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins., 908 A.2d 888 (Pa. 2006), undertook to give precise meaning to an CGL insurance policy's use of the word "occurrence."  Id. at 897–88.  Consulting Webster's II New College Dictionary, the court remarked that an "accident" constituted "[a]n unexpected and undesirable event," or "something that occurs unexpectedly or unintentionally."  Id. at 898–99 (citing Webster's II New College Dictionary 6 (2001).  It noted that the key term in this ordinary definition was "unexpected," and that "[t]his implies a degree of fortuity that is not present in a claim for faulty workmanship."  Id. at 899.  Upon engaging in an extensive survey of jurisprudence from other jurisdictions, the court

14

concluded:

> We hold that the definition of "accident" required to establish an "occurrence" under the policies cannot be satisfied by claims based upon faulty workmanship. Such claims simply do not present the degree of fortuity contemplated by the ordinary definition of "accident" or its common judicial construction in this context. To hold otherwise would be to convert a policy for insurance into a performance bond. We are unwilling to do so, especially since such protections are already readily available for the protection of contractors.

Id. at 899 (internal footnotes omitted). Likewise, the court rejected the argument that faulty or negligent workmanship constitutes an "accident" so long as the insured did not intend for the subsequent damage to occur. Id. at 899 n.9 ("We believe that this is an overly broad interpretation of accident as the situation is rare indeed in which a contractor intends that the work product suffer injury . . . [W]e believe that CGL policies are not the proper means to protect against such risks.").

The Superior Court of Pennsylvania reached a similar conclusion in a case factually analogous to the one at bar. In Millers Capital Ins. Co. v. Gambone Bros. Dev. Co., 941 A.2d 706 (Pa. Super. Ct. 2008), the insured was a housing developer, and the plaintiffs in the underlying action alleged that faulty construction resulted in severe leaking which damaged the interiors of their homes. Id. at 713. While the insured conceded Kvaerner's principle that an insurance claim on an "occurrence" based CGL policy cannot be premised on faulty workmanship, it asserted that the underlying action "involve[d] claims for ancillary and accidental damages caused by the resulting water leaks to non-defective work inside the home interiors," and that those claims alleged "an 'occurrence' even though the damage to the faulty stucco exteriors [did] not." Id. On review, the Pennsylvania Superior Court found no distinction from Kvaerner and held that "natural and foreseeable acts . . . which tend to exacerbate the damage, effect, or consequences caused *ab initio* by faulty workmanship also cannot be considered sufficiently fortuitous to constitute an

'occurrence' or 'accident' for the purposes of an occurrence based CGL policy." Id.

The United States Court of Appeals for the Third Circuit has likewise adopted these principles as established Pennsylvania law.  In Nationwide Mut. Ins. Co. v. CPB Int'l, 562 F.3d 591 (3d Cir. 2009), the question involved an insurance company's defense and indemnification obligations in an action, which both alleged that the insured breached a contract for the delivery of goods by providing a defective product and sought consequential damages for that breach.  Id. at 593.  As in the present case, the policy covered "occurrences" which were defined as "accidents." Id. at 594.  The insured argued that because the underlying complaint alleged consequential damages, as opposed to just property damage to the work product itself, it came within the ambit of the policy.  Id. at 596.  The Third Circuit, however, disagreed finding that the foundation of the holding in Kvaerner was that "it is largely within the insured's control whether it supplies the agreed-upon product, and the fact that contractual liability flows from the failure to provide that product is too foreseeable to be considered an accident."  Id.  It went on to reaffirm that "'the purpose and intent of a general liability insurance policy is to protect the insured from essentially accidental injury to the person or property of another rather than coverage for disputes between parties to a contractual undertaking.'"  Id. at 598 (quoting Pa. Mfrs' Ass'n. Ins. Co. v. L.B. Smith, Inc., 831 A.2d 1178, 1181 (Pa. Super. Ct. 2003)).

Finally, in Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co., 609 F.3d 223 (3d Cir. 2010), the insured manufactured synthetic turf fields for installation at several schools, which ultimately failed and caused extensive damage.  Id. at 227–28.  The question at issue was whether the insurance company had a duty to defend its insured in a lawsuit filed by the schools, which alleged both breach of contract and negligent design, manufacture, and installation.  Id. at 229, 238.  On review,

the Third Circuit recognized that, based on Kvaerner, Gambone, and CPB International,

"Pennsylvania law interprets 'occurrence' based coverage like that provided to [the insured] in

accordance with its literal text." Id. at 231. Thus, "[i]n order for a claim to trigger coverage, there

must be a causal nexus between the property damage and an 'occurrence,' *i.e.*, a fortuitous event.

Faulty workmanship, even when cast as a negligence claim, does not constitute such an event, nor

do natural and foreseeable events like rainfall." Id. at 231.

Numerous district court cases have similarly adopted Kvaerner's definition of "occurrence"

to exclude faulty workmanship, even when cast as a negligence claim. See, e.g., Bomgardner v.

State Farm Fire & Cas., No. Civ.A.10-1287, 2010 WL 3657084, at *4 (E.D. Pa. Sept. 14, 2010)

(citing Kvaerner and CPB to find that "[c]laims based on defective workmanship and claims arising

out of a breach of contract do not allege an 'occurrence,' and therefore do not trigger coverage under

a commercial liability policy such as this one"; the court rejected the argument that unexpected and

unintentional problems resulting from the defective workmanship fell within the definition of

"occurrence"); Meridian Mut. Ins. Co. v. James Gilligan Builders, No. Civ.A.08-1995, 2009 WL

1704474, at *5 n.10, *6 (E.D. Pa. June 18, 2009) (finding that claims of defective workmanship do

not fall within the definition of "occurrence" and do not trigger coverage under a CGL policy where

the underlying complaint, while premised largely on a negligence theory, really sounds in a breach

of contract); Bituminous Cas. Corp. v. John W. Gleim, Jr., Inc., No. Civ.A.07-2287, 2009 WL

473034, at *4 (M.D. Pa. Feb. 24, 2009) (finding that claims of property damage based on intentional

concealment, intentional misrepresentation, and fraud are not "occurrences" under a general liability

insurance policy); Peerless Ins. Co. v. Brooks Sys. Corp., 617 F. Supp.2d 348, 356–57 (E.D. Pa.

2008) (finding that insured was not entitled to coverage or defense in underlying complaint of

17

breach of contract, breach of warranty, and professional negligence because the allegations of the underlying complaint clearly allege faulty workmanship within the parameters of Kvaerner).

In light of the controlling jurisprudence from the Pennsylvania Supreme Court and the Third Circuit, together with the wealth of case law hailing from lower state and federal courts, this Court interprets the term "occurrence" in the Westfield Policies to exclude contractual claims for faulty workmanship.  In addition, the Court finds that negligence claims based on and alleging foreseeable damages from faulty workmanship likewise fall outside the ambit of the Policies.

### 2.      Whether the Underlying Actions Fall Within the Bounds of Coverage

"Once the policy's coverage has been determined, the court must examine the underlying complaint to ascertain whether its factual allegations trigger coverage." Bituminous Cas. Corp., 2009 WL 473034, at *4.  Given the broad nature of the duty to defend, the court must construe the factual allegations of the underlying complaint liberally and resolve all doubts as to coverage in favor of the insured. . . . This analysis must focus upon the substance of the allegations rather than on 'the particular cause of action that a complainant pleads.'" Id. (quoting Erie Ins. Exch. v. Muff, 851 A.2d 919, 926 (Pa. Super. Ct. 2004)).

As set forth above, Pennsylvania law holds that a general liability policy protects against "essentially accidental injury," and not merely contract disputes.  Nationwide Mut. Ins., 562 F.3d at 598 (quoting Pa. Mfrs.' Ass'n Ins. Co., 831 A.2d at 118).  Nonetheless, "just as the term 'negligence' cannot *per se* convert a contract into a tort claim, the presence of a contract, or breach of contract claim, does not inevitably convert every related claim into one of 'faulty workmanship.'" Robinson Fans Holdings, 2011 WL 1327435, at *3.  Rather, "there is a discernible distinction between a product that actively malfunctions, which could give rise to an 'accident,' and flawed

product-related work done in performance of a contract, which cannot." Id.  More succinctly stated, "negligent or defective design, in a case in which the product is designed pursuant to and in accordance with a contract, is necessarily part and parcel of the contract performance.  In contrast, if a product was negligently or defectively designed, and then supplied pursuant to a subsequent contract, the design work might be measured against tort standards of care rather than agreed-upon terms." Id.

Notably, in the context of faulty workmanship cases, there is "substantial case law in Pennsylvania and the Third Circuit stating that breach of contract, breach of warranty, *and even negligence claims* do not give rise to an 'occurrence' when it means 'accident' as it does here." L.R. Costanzo Co. Inc. v. Am. Fire & Cas. Ins. Co., No. Civ.A.10-774, 2012 WL 37081, at *4 (M.D. Pa. Jan. 6, 2012) (emphasis added).  The Third Circuit, in Specialty Surfaces, offered significant guidance on this issue.  As indicated above, that case involved occurrence-based coverage for a suit alleging that a subcontractor was to construct and install synthetic turf fields made by a separate manufacturer, and to install drainage systems.  609 F.3d at 227.  The underlying complaint alleged breach of contract/breach of warranty claims against the manufacturer, as well as a negligence claim, based on the insured's faulty workmanship at a job site.  Id. at 238.  Specifically, the negligence claim asserted that the contractor and subcontractor, but not the manufacturer, were "negligent in designing, manufacturing, and installing a suitable and compatible subdrain system and impermeable liner *in compliance with the contract documents*," thus resulting in damage to the synthetic turf at the site, as well as the impermeable liner, the subdrain system and the subgrade.  Id. (emphasis added).  On review, the Third Circuit found that the insurer "was not required to defend . . . because the allegations in the amended complaint do not support a determination that any damage

19

was caused by an 'occurrence.'" Id.  It reasoned that "[a]ny damages to [the insured's] own work product based on [the insured's] alleged negligence are claims of damage based on faulty workmanship.  Because they [were] not caused by an accident, under Kvaerner, they [were] not a covered 'occurrence' under the insurance policy." Id.  As such, the faulty design claims were asserted under the parties' contract, as an alleged failure to perform pursuant to the standards in that contract, and any damage to the subgrade caused by that workmanship was entirely foreseeable. Id. at 239.

Along these same lines is the case of Bomgardner v. State Farm Fire and Cas., No. Civ.A.10-1287, 2010 WL 3657084 (E.D. Pa. Sept. 14, 2010).  In that matter, the insured installed a concrete floor at a residence under construction, which subsequently resulted in damage to the property. Id. at *1.  The general contractor demanded reimbursement for repairs it made on the insured's behalf. Id.  The insured then notified his insurance company, which investigated and determined that the defects in the floor were considered "improper workmanship" and not an "occurrence," as required by the policy. Id. at *2. In the subsequent coverage case, the insured argued that the blame lay with the concrete manufacturer and not with its workmanship and, as such, the resulting problems were "unexpected and unintentional." Id. at *4.  Upon consideration of the insured's coverage decision, the court determined that no duty to defend or indemnify existed, holding that:

> Although [the insured] asserts that his claim is not one for faulty workmanship because the blame lay with [the concrete manufacturer], this argument is unavailing.  Assuming, as we must, that the fault was entirely [the manufacturer's], the underlying claim is nonetheless one based on improper workmanship. That [the manufacturer] was responsible for the defective concrete does not convert the claim into one based on an "accident."

Id. at *4.  Accordingly, the court granted the insurer's motion to dismiss.

As a final example, <u>Meridian Mut. Ins. Co. v. James Gilligan Builders</u>, No. Civ.A.08-1995, 2009 WL 1704474 (E.D. Pa. June 18, 2009) involved an underlying complaint brought by homeowners against the builders of their home alleging that the home leaked at several locations and continued to leak despite repeated efforts to repair. <u>Id.</u> at *1. The underlying complaint claimed breach of contract, breach of express and implied warranties, negligence, and violations of the Unfair Trade Practices and Consumer Protection Law. <u>Id.</u> The builders impleaded the insured, who installed the windows, and alleged that the insured was liability for contribution and indemnification. <u>Id.</u> The insured sought defense from its insurer under an "occurrence" based policy and the insurer declined coverage on the grounds that the underlying complaint did not allege an "occurrence." <u>Id.</u> On review of the coverage dispute, the court remarked that the underlying complaint alleged defects in "stucco application, sealing at the windows, doors, and other penetration points through the stucco, missing flashings, and other defects in the windows and roofing." <u>Id.</u> at *6. It went on to note that, notwithstanding the underlying complaints' characterization of the causes of action, "[i]t is evident that [the homeowners'] claims are based on faulty workmanship. . . . The resulting damage is typical of poor workmanship." <u>Id.</u> Because it found that the Pennsylvania Supreme Court made clear that "commercial general liability insurance policies are not work product guarantees," the court held that the insurer did not have a duty to defend the faulty workmanship claim. <u>Id.</u>

On the opposite end of the spectrum, however, is a series of cases where claims of negligence in the context of faulty workmanship have been deemed to potentially rise to the level of an occurrence. Nonetheless, these cases have noticeable distinctions. For example, in <u>Schuylkill Stone Corp. v. State Auto. Mut. Ins. Co.</u>, 735 F. Supp. 2d 150 (D.N.J. 2010), thirty-nine

homeowners filed a complaint alleging that the developer and its affiliates and subcontractors defectively designed and constructed their homes in an unworkmanlike and unsatisfactory manner, and also failed to comply with building codes and laws, industry standards, design documents, and the requirements in written contracts and implied and express warranties.  Id. at 153.  The homeowners claimed that their homes sustained water damage due to the construction problems, and that they suffered "not only property damage, but also injury to their health through mold and mildew exposure."  Id.  Distinguishing Kvaerner and its progeny, the court, applying Pennsylvania law, found that the underlying complaint alleged that the contractor negligently failed to comply with industry standards in the construction of their homes and that part of that negligence was allegedly perpetrated by the insured, which installed the stone facade to four of the plaintiffs' homes.  Id. at 158.  The court remarked that,

> The plaintiffs did not contract with [the insured] for a specific product and installation procedure, and then allege that [the insured's] failure to follow those specifications resulted in the foreseeable consequence of water infiltration.  Instead, the [underlying plaintiffs] claim that they were subjected to [the insured's] negligent work performance and negligently manufactured products in violation of industry standards.  Such negligence, as opposed to contractual breaches or intentional conduct, is the definition of 'accident.'

Id. at 158.  Moreover, the court noted that "[t]o further support the fortuitous nature of the [underlying] plaintiffs' claims are their claims for not only property damage as a result of [the insured's] negligence, *but also for their personal injuries*" due to their exposure to mold and mildew."  735 F. Supp. 2d at 158–59 (emphasis added).  Such personal injury claims took the case "well beyond Kvaerner" into the realm of a fortuitous event covered by the policy.  Id. at 159.

Likewise, in Nat'l Fire Ins. Co. of Hartford v. Robinson Fans Holdings, Inc., a dispute arose out of the alleged failure of three industrial fans that the insured allegedly designed, manufactured,

and sold to Archer-Daniel-Midlands Co. ("ADM").  2011 WL 1327435, at *1.  In the underlying

suit, ADM alleged that the insured, pursuant to a contract, provided it with certain equipment which

"failed catastrophically" and that the equipment "contained design defects causing the failures."  Id.

The underlying complaint asserted claims for breach of contract, breach of express warranty, breach

of implied warranties of fitness for a particular purpose and merchantability, and negligence in

design.  Id.  The court considered whether the insurer had a duty to defend under an "occurrence"

based policy and determined that it lacked a sufficient basis to determine whether the underlying

complaint alleged an occurrence:

> Here, the underlying complaint states a claim entitled, "negligence in design."  In so
> doing, it avers that the insured "agreed to provide" equipment that conformed with
> ADM's performance specifications; "designed" the equipment, at some unspecified
> point in the case chronology; and "selected materials for and manufactured the
> equipment."  Further, the complaint states that the "negligence" and "design defects"
> caused "catastrophic failure" of the equipment.  *The complaint lacks any factual
> allegation that the insured undertook to design the equipment pursuant to mutual
> consensus or agreement, or instead, for example, supplied a fan designed long before
> Robinson and ADM contracted*. . . .  Therefore, there is no basis for decisively
> concluding either that the complaint alleges failure to exercise care in duties imposed
> by contract, or those imposed extra-contractually by law.  *One possibility is equally as
> likely as the other.*

Id. at *5 (emphasis added).  Ultimately, the court held that "[a]lthough it may ultimately prove

otherwise, the four corners of the complaint—to which the relevant inquiry is bound—potentially

point to a breach of duty imposed by law via social policy, and independent of the contract, which

caused the catastrophic failure, I cannot rule out the possibility that something other than faulty

workmanship is blamed for the equipment failure."  Id. (footnote omitted).

Faced with this plethora of jurisprudence, this Court is now left with the formidable task of

examining the complaints in the Underlying Actions to determine if an obligation to defend exists.

As repeatedly noted, "[i]n determining whether an insurer has a duty to defend, the Court must compare coverage afforded under the policy with the factual allegations contained in the four corners of the complaint. . . . [W]hile the allegations in the underlying complaint will trigger a duty to defend, 'the particular cause of action that a complainant pleads is not determinative of whether coverage has been triggered.'"  Whole Enchilada, Inc. v. Travelers Prop. Cas. Co. of Am., 581 F. Supp. 2d 677, 694 (W.D. Pa. 2008) (quoting Mut. Benefit Ins. Co. v. Haver, 725 A.2d 743, 745 (Pa. 1999)).  As set forth in detail above, each of the Underlying Actions shares great commonality in their pleaded causes of action.  Plaintiff Westfield contends that all of the complaints in those Actions allege that the plaintiffs suffered damage to their homes due to the faulty workmanship in constructing the homes by BHC.  Further, all of the complaints have breach of contract/breach of express warranty claims.  Finally, most of the complaints bring additional tort claims based on the faulty workmanship claims, including negligence, breach of implied warranty, negligent misrepresentation, fraudulent misrepresentation, violation of unfair trade practices and consumer protection law, and product liability.  According to Plaintiff, the allegations underlying all of these claims concern the purported poor workmanship of BHC and the foreseeable consequences of that workmanship.

Defendants, however, argue that damages resulting from alleged negligence, breach of implied warranty, and negligent misrepresentation "arguably constitute damages caused by an 'occurrence', as defined by the policies at issue, as thus defense of such claims are covered." (Defs.' Resp. Opp'n Mot. Summ. J. 6.)  In other words, Defendants assert that these allegations are necessarily "extra-contractual" in that they go to BHC's negligence in concealing the full extent of the leaking problems long after construction, in failing to test products post-construction, in failing

to properly advise the local municipality of certain events, and in making its subcontractor employment decisions. "Thus, on their face, each underlying complaint—at least *potentially*—avers an 'occurrence.'" (Id. (emphasis in original).)

Upon independent review of the allegations of the Underlying Actions, however, the Court must disagree with Defendants and find that this case is more akin to Specialty Surfaces, Bomgardner, and Meridian Mutual. First and foremost, each of the Underlying Actions has an explicit basis in contract. Each complaint specifically alleges that the defective nature of the work at the properties, together with the resultant water damage, are covered by an express warranty prepared by the Defendants. (Barto Compl. ¶ 35; Crowley Compl. ¶ 38; Eberle Compl. ¶¶ 71, 74, 79–81; Ench Compl. ¶ 45; Epstein Compl. ¶ 35; Francois Compl. ¶ 39; McCullough Compl. ¶ 36; Travers Compl. ¶ 39.) Undoubtedly, any claims arising out of this contractual duty cannot, pursuant to well-established Pennsylvania law, constitute "occurrences" for purposes of coverage under the Westfield Policies.

The more difficult inquiry is whether the negligence, breach of implied warranty, and negligent misrepresentation claims potentially aver an "occurrence" under the policy. Considering the factual allegations of the Underlying Actions, it is unquestionable that "[w]ithout an agreement, the work would not have been performed and thus the damages would not have occurred." Transp. Ins. Co. v. C.F. Bordo, Inc., No. Civ.A.06-2386, 2009 WL 839366, at *9 (M.D. Pa. Mar. 30, 2009). Each of the Underlying Actions explicitly alleges, in some form, that Defendants assured, warranted, implied, and otherwise indicated to the original buyers of the Properties, that the Properties were fit for habitation, built with good workmanship, and free from defects, and that the Properties would comply with specifications set forth in the various contractual materials. (Barto

Compl. ¶ 10; <u>Crowley</u> Compl. ¶ 12; <u>Eberle</u> Compl. ¶ 15; <u>Ench</u> Compl. ¶ 12; <u>Epstein</u> Compl. ¶ 10; <u>Francois</u> Compl. ¶ 10; <u>McCullough</u> Compl. ¶ 13; <u>Travers</u> Compl. ¶ 12.)  Quite unlike <u>Robinson Fans</u> and <u>Schuylkill Stone</u>, there is no suggestion that the homes were negligently designed or supplied prior to the execution of any contract or outside of mutually agreed-upon standards.  Rather, it is clearly alleged that the products at issue here—the various homes—were designed pursuant to and in accordance with a contract, making the construction necessarily "part and parcel of the contract performance." <u>Robinson</u>, 2011 WL 1327435, at *3.  In addition, the damages alleged by the plaintiffs in these Actions are either damages directly to the work product of the insured or damages that are "a reasonably foreseeable result of the faulty workmanship." <u>See Specialty Surfaces</u>, 609 F.3d at 239; <u>see also</u> <u>Gambone</u>, 941 A.2d at 713–14.  Unlike <u>Schuylkill Stone</u>, the Underlying Actions have no claims of accidental personal injury.  As such, the four corners of the complaints clearly point to a breach of duty imposed by mutual consensus and not to one imposed by social duty.[2]  To now require that Plaintiff cover such events would directly contravene Pennsylvania law by converting a CGL policy into a professional liability policy or a

---

[2]  Although not expressly raised by Defendants, the Court acknowledges that each of the underlying complaints makes a cursory reference to Defendants' failure to comply with industry standards.  (<u>Barto</u> Compl. ¶ 20(g); <u>Crowley</u> Compl. ¶ 23(f); <u>Eberle</u> Compl. ¶ 30; <u>Ench</u> Compl. ¶ 29(g); <u>Epstein</u> Compl. ¶ 20(f); <u>Francois</u> Compl. ¶ 23(g); <u>McCullough</u> Compl. ¶ 21(f); <u>Travers</u> Compl. ¶ 24(f).)  These allegations, however, are couched within the context of Defendants' contractual agreement to build a home in accordance with such standards.  This interpretation is bolstered by the fact that the actual causes of action aver that the Defendants' liability lies in their failure to construct a home as expressly warranted.  Nothing in these complaints suggests that Defendants' liability stems from a breach of duty imposed by social standards.  <u>See</u> <u>Peerless Ins. Co.</u>, 617 F. Supp. 2d at 356 (finding that claim for breach of professional duties resulting, in part, from insured's failure to "follow acceptable industry standards for construction" clearly alleged faulty workmanship, which could not constitute an "occurrence").

performance bond.[3]

This conclusion is bolstered by the state court proceedings in the Underlying Actions. The

trial judge in four of the cases—<u>Travers</u>, <u>Barto</u>, <u>Francois</u>, and <u>Eberle</u>—dismissed the negligence and

negligent misrepresentation causes of action on the grounds that, under a gist of the action analysis,[4]

---

[3] Defendants also cite to <u>Wausau Underwriters Ins. Co. v. State Auto. Mut. Ins. Co.</u>, 557 F. Supp. 2d 502 (D.N.J. 2008). That case, however, is inapposite. In <u>Wausau</u>, the underlying litigation involved claims by property owners involving various defects in their property. <u>Id.</u> at 505. The insured was brought into the action as the manufacturer and/or distributor of the materials utilized in the construction of the stone fascia of the homes in question. <u>Id.</u> The court found this case distinguishable from <u>Kvaerner</u> because the insured "had no contractual relationship with the [plaintiffs] (at least . . . . allege[d] no such relationship), and the underlying claims [were] not for breach of contract." <u>Id.</u> at 514. It went on to find such a distinction meaningful because, where the insured in <u>Kvaerner</u> specifically agreed to build its product according to certain specifications in the contract and warranted that it would be free from defect, the insured in <u>Wausau</u> did not construct/design the materials at issue pursuant to any contract. <u>Id.</u> at 514–15. Rather, the warranty allegedly breached was a warranty implied by law and the damage did not result from the insured's failure to live up to standards bargained and established itself. <u>Id.</u> at 515.
     The present case, however, involves the construction of a home pursuant to certain agreed-upon contractual standards. Unlike in <u>Wausau</u> where the damage-causing workmanship was completed prior to and outside of any contractual relationship, the damage-causing workmanship in this case was performed only in respect to such a contractual relationship. To hold that damages resulting from such faulty workmanship was fortuitous would directly contradict the holding of <u>Kvaerner</u>.

[4] "When a plaintiff alleges that the defendant committed a tort in the course of carrying out a contractual agreement, Pennsylvania courts examine the claim and determine whether the 'gist' or gravamen of it sounds in contract or tort; a tort claim is maintainable only if the contract is 'collateral' to conduct that is primarily tortious." <u>Sunquest Info. Sys., Inc. v. Dean Witter Reynolds</u>, 40 F. Supp. 2d 644, 651 (E.D. Pa. 1999). To make this determination, the court must ascertain the source of the duties allegedly breached. <u>Sunburst Paper, LLC v. Keating Fibre Int'l</u>, No. Civ.A.06-3959, 2006 WL 3097771, at *2 (E.D. Pa. Oct. 30, 2006). The doctrine bars tort claims: (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract. <u>eToll, Inc. v. Elias/Savion Adver., Inc.</u>, 811 A.2d 10, 19 (Pa. Super. Ct. 2002). "In other words, if the duties in question are intertwined with contractual obligations, the claim sounds in contract, but if the duties are collateral to the contract, the claim sounds in tort." <u>Sunburst Paper</u>, 2006 WL 3097771, at *2.

the actions arose in contract and not tort.  Specifically, in <u>Francois</u>, the judge, when faced with the BHC Defendants' motion for judgment on the pleadings, expressly held that "*[a]ll of the failures alleged in and incorporated into Count I (negligence) are actionable, if at all, based upon the contract between the parties*.  Thus, Count I impermissibly attempts to recast an ordinary breach of contract claim into a tort claim."  (Pl.'s Reply Br., Ex. H, n.1 (emphasis added).)[5]  In so holding, the court reasoned that the plaintiffs claims arose out of breaches of duties imposed by mutual consensus as opposed to breaches of duties imposed as a matter of social policy.  (<u>Id.</u>)  Although the court did not reach the issue in <u>Crowley</u>, <u>Ench</u>, <u>Epstein</u>, or <u>McCullough</u>, this resulted from a failure of BHC to raise the issue in those cases and not necessarily for a lack of merit to the argument.  Indeed, the negligence claims in those actions are, as noted by Plaintiff, verbatim to the claims in <u>Francois</u> and <u>Travers</u>.  Accordingly, it is more than reasonable to assume that the trial court would

---

[5]  These court orders were brought to this Court's attention via Plaintiff's Reply Brief. Defendants vigorously object to Plaintiff's filing of a Reply Brief on the grounds that (a) it failed to follow the undersigned's procedures, and (b) that there is no "new matter" raised by Defendants' Response that, in fairness, would require that Plaintiff be given further leave to respond.

The Court finds no merit to these objections. Although Chambers' procedures suggest that counsel simply notify the Court by letter of its intention to file a reply brief, this procedure is simply to place the Court on notice that more briefing is forthcoming and it should refrain from ruling on the matter.  Plaintiffs' filing of a timely motion seeking leave to file the reply—merely eight days after the response brief was docketed—accomplishes the same purpose.  Moreover, the Court often finds reply briefs useful to address matters raised in the responsive brief.  This case is no different.  Defendants adamantly argued in their Response that the Underlying Actions raised the possibility of "occurrences" and that several of the underlying plaintiffs were not original owners and, thus, did not have a direct contract with Defendants.  While Plaintiff touched on these issues in the original Motion for Summary Judgment, the Reply Brief was able to more directly address the precise arguments presented by Defendants.  Accordingly, Plaintiff's Motion for Leave to File a Reply Brief is granted, and the Reply Brief attached as an exhibit to that Motion is deemed filed as of the date the Motion for Leave was docketed.

likewise find those claims to arise solely out of the contractual relationship between the parties.[6]

For this Court to now find a possibility that some of these claims sound in tort—and thus constitute

"accidents"—for purposes of insurance coverage would directly undermine the interpretation of the

claims by the trial judge responsible for trying the Underlying Actions.[7]

In a last-ditch attempt to sidestep this finding, Defendants argue that the <u>Travers</u>, <u>Epstein</u>,

<u>Barto</u>, and <u>McCullough</u> Actions involve parties who are not the original purchasers of the homes

manufactured by BHC.  Thus, in these instances, Defendants argue that there is no direct contract

between the underlying plaintiffs and BHC, creating more than the mere potential that the alleged

_____

[6] To the extent Plaintiff asks this Court to perform its own gist of the action analysis, (Pl's Reply Br. 6–8), the Court declines to do so.  In <u>Berg Chilling Sys. v. Hull Corp.</u>, 70 F. App'x 620 (3d Cir. 2003), the Third Circuit clearly held that the "gist of the action" doctrine does not apply to a duty to defend analysis.  <u>Id.</u> at 624.  By the same token, however, this Court recognizes that, to the extent the presiding court in the underlying action has ruled on the applicability of that doctrine, its ruling guides the coverage decision.  As explained by our sister court, "the appropriate parameters of [the underlying litigation] are issues for the presiding court. If that court decides that the gist of the action was contractual, otherwise bars the underlying plaintiff's negligence claims, or causes the underlying plaintiff to clarify his claims" then the declaratory issue before the federal court takes on a "decidedly different tenor."  <u>Nat'l Fire Ins. Co. of Hartford v. Robinson Fans Holdings, Inc.</u>, No. Civ.A.10-1054, 2011 WL 2842303, at *4 (W.D. Pa. July 18, 2011).

In the present matter, to the extent the trial court has already decided that the gist of the action doctrine bars certain claims, this Court will apply that finding to the insurance coverage decision.  Further, the Court will extrapolate that ruling to apply to identical complaints in other Underlying Actions where the gist of the action issue has not been raised.

[7] Defendants argue that the complaints in the Underlying Actions still have breach of implied warranty counts which could "potentially" give rise to tort liability.  This argument again misunderstands applicable jurisprudence.  The inquiry is not whether the claims are defined by the Plaintiffs as contract or tort, but rather whether the supporting factual allegations have a sufficient degree of fortuity to constitute an occurrence as defined in the Westfield Policies. Being that the trial court has expressly found that the entirety of the action is based on claims of faulty workmanship, and the Pennsylvania Supreme Court has explicitly held that claims of faulty workmanship cannot constitute an "occurrence" under a commercial general liability policy, the mere remainder of a breach of implied warranty claim does not convert the basis of the Underlying Actions into the type of accident required for insurance coverage.

tort claims are actually based in tort rather than contract.  (Defs.' Resp. Opp'n Mot. Summ. J. 15.)

This Court, however, must disagree on several grounds.  As a primary matter, it is not the existence

of the contract *per se* that causes the claims at issue to not be "occurrences," but rather the fact that

they all stem from faulty workmanship and allege damages solely to the work product of the

insured.  See Meridian Mut., 2009 WL 1704474, at *5 n.10 (finding that the absence of a contract in

the underlying action irrelevant where the faulty workmanship was in breach of a mutual

understanding and not of some duty imposed by social policy).  Pennsylvania law explicitly declines

to recognize this type of claim as accidental in nature, regardless of the framework in which it is

cast.  Second, all four of the complaints in those actions unequivocally alleged the existence of an

express warranty—a fact that, for purposes of determining coverage, this Court must accept.

Finally, as noted above, in Travers and Barto, two of the cases where the plaintiffs are not the

original homeowners, the BHC Defendants presumably moved for dismissal of the negligence

claims on the precise ground that these claims *were based on an express contract*.  The trial court

judge agreed with Defendant's position and dismissed all of the negligence averments under the gist

of the action doctrine.  In Travers, for example, the trial judge found:

> Count I alleges that plaintiffs' predecessors in interest entered into a contract with
> defendant BHC Venture, Inc. for the sale of a new home and that plaintiffs themselves
> had direct contact with defendants regarding repair work.  Plaintiffs further allege that
> defendants failed, *inter alia*, to construct the home in a workmanlike manner.  ***These
> claims arise, if at all, pursuant to contract.  Plaintiffs' rights arise by virtue of their
> acquisition of the property from their predecessors in title*** and their rights can rise no
> higher than those predecessors who[] could not breach of contract claims fashioned as
> tort claims.

(Pl.'s Reply Br., Ex. J (emphasis added).)  The judge followed the same course in the Barto

complaint, (id., Ex. K), and would presumably do so in Epstein and McCullough given the identical

30

nature of the causes of actions.

In sum, the Court finds that all of the Underlying Actions are based entirely on claims of faulty workmanship. Under well-established Pennsylvania law, claims of and damage resulting from faulty workmanship do not have a sufficient degree of fortuity contemplated by the ordinary definition or common judicial construction of the term "accident." Because the Westfield Policies define the term "occurrence" as an "accident" and because the Policies require an "occurrence" to trigger coverage, nothing in the Underlying Actions potentially comes within the insurance coverage. Accordingly, the Court finds that Plaintiff has no duty to defend Defendants in the Underlying Action. In turn, Plaintiff's Motion for Summary Judgment on its defense count is granted.

### B.    Duty to Indemnify

Under Pennsylvania law, "[a]n insurer is required to indemnify only where the insured is held liable for a claim actually covered by the policy." USX Corp. v. Adriatic Ins. Co., 99 F. Supp. 2d 593, 611 (W.D. Pa. 2000) (citing Gen. Accident Ins. Co. of Am. v. Allen, 692 A.2d 1089, 1095 (Pa. 1997)). "As a general rule, a court entertaining a declaratory judgment action in an insurance coverage case should refrain from determining the insurer's duty to indemnify until the insured is found liable for damages in the underlying action." Victoria Ins. Co. v. Mincin Insulation Servs., Inc., No. Civ.A.08-909, 2009 WL 90644, at *5 (W.D. Pa. Jan. 14, 2009) (quotation omitted). It is well-established, however, that although a duty to defend can exist without a duty to indemnify, a duty to indemnify cannot exist without a duty to defend. The Frog, Switch & Mfg. Co., Inc. v. The Travelers Ins. Co., 193 F.3d 742, 746 (3d Cir. 1999). Thus, once a court finds that there is no duty to defend, it must necessarily hold that there is no duty to indemnify either. Meridian Mut., 2009

31

WL 1704474, at *6.

In the present matter, the Court has already found that Westfield has no duty to defend BHC in the Underlying Actions.  In turn, Westfield can have no duty to indemnify BHC under the Westfield Policies.  Accordingly, Westfield is entitled to a declaratory judgment on its indemnification count as well.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court must find in favor of Plaintiff and against Defendants on the entirety of the Complaint.  Primarily, no potential exists that the Underlying Actions could fall within the ambit of the Westfield Policies.  In turn, Plaintiff has no duty to defend Defendant in such Actions.  Without such a duty to defend, the Court must find that Plaintiff could not be held liable for any claim actually covered by the Westfield Policies.  Therefore, summary judgment is entered in favor of Plaintiff and against Defendant, a Declaratory Judgment shall be entered on Plaintiff's behalf, and this case shall be closed.